JOHN WESLEY KELLY, JR. *v.* STATE OF MARYLAND

[No. 388, September Term, 1971.]

*Decided February 3, 1972.*

The cause was argued before THOMPSON, POWERS and CARTER, JJ.

*John D. Hackett* for appellant.

*Donald R. Stutman, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Phillip E. Epstein, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

John Wesley Kelly, Jr. appeals from his conviction of murder in the first degree, without capital punishment, by a jury in the Criminal Court of Baltimore, and sentence to life imprisonment imposed by Judge Anselm Sodaro, who presided at the trial. The murder victim was Allen Jones, a ten year old boy.[1]

Appellant urges here that the trial judge erred:

1. In denying appellant's motion for judgment of acquittal.[2]

---

1. Consistently throughout the transcript of the trial, the victim's first name was written as "Alan".

2. Appellant's brief presents five questions, but two of them merely suggest different aspects of the sufficiency of the evidence.

2. In admitting evidence of statements made to the police by appellant.

3. In his rulings on a series of motions filed or made by appellant.

### The Evidence

We shall open this extensive recital of the evidence with the facts supplied by the witness Joann Black, although it will be necessary from time to time to revert to earlier events. Mrs. Black lived at 725 George Street in Baltimore in an apartment on the 13th floor of a 14 story building. Between 1:30 and 2:00 A.M. on May 21, 1970, she was sitting on the balcony of her apartment. From that point she was facing and overlooking the house at 831 W. Franklin Street, not quite a half a block away, and the house next to it, which were the only ones still standing in the area. They were vacant.

When she had been sitting there about 15 or 20 minutes she saw a blaze of fire come up from the rear of the house at 831 Franklin, and by the light of the blaze and of a street light she saw a man come from the rear of the house, across the lot and cross to the other side of Franklin Street. He was carrying something that she said could have been a shopping bag. She hollered for the people on the balcony below her to call the Fire Department. She ran down the steps, and the fire trucks arrived before she did. She talked to police at the scene.

Officer Scott Reilly heard units summoned for a fire, and since this part of Franklin Street was his post, he went to the scene. Several police cars had already arrived. Fire equipment arrived about a minute later. It was his duty to make a report, so he talked to various people at the scene. Among the people he talked to was appellant, whom he first saw sitting in the back seat of a police car. He was pointed out to Officer Reilly by another officer as a person who was there when that officer arrived.

Appellant told Officer Reilly that earlier in the evening, he had been with his girlfriend, Vanessa Jones, and both were looking for her brother, Alan Jones. He said they

had found him, and hold him to go home. Appellant also told Officer Reilly that he had been walking on Franklin Street, by the front of the house that was on fire and he heard a voice saying, "Johnny help me, Johnny help me". He thought it was a little boy's voice, but he didn't know.

The body of Alan Jones was found in the house. He was pronounced dead at 3:00 A. M. on May 21, 1970. Early that afternoon an autopsy was performed at the morgue. The skin and tissue on 70 percent of the body were burned off down to the muscle. Three stab wounds were found, one in the abdomen and two in the back. They were made by a sharp instrument about a half inch wide, but none was very deep, and they did not contribute to death. The Assistant Medical Examiner who performed the autopsy testified that there were two head wounds, one he described as a hole in the right side of the skull five and a fourth inches by two and a half inches, causing a tear through the dura, with brain tissue herniating out of the defect. The other was a fracture of the skull on the left side. At least one of the head injuries was caused by a blow with a blunt instrument; the other could have been caused by a blow or by a fall.

Examination of the blood showed the presence of 40 percent carbon monoxide. The witness explained that carbon monoxide is a gas formed by the incomplete combustion of carbon, and is present in all fires. The lethal level is 40 to 60 percent in persons with no other injuries or disease process. It was the opinion of the witness that the death of Alan Jones was caused by a combination of the head injuries and the carbon monoxide. It was not determined whether there had been or had not been any sexual molestation of the boy. The contents of the stomach was about 100 cc's of noodles and a thick fluid.

Captain George A. Powell, of the Investigation Bureau of the Fire Department, arrived at the scene about 2:45 A. M. and made an investigation to determine the cause of the fire. The house was empty, with no utilities. The

fire had been at the rear of the house, concentrated on the first floor, but involving all three floors. There had been intense burning. He found evidence that a flammable liquid had been poured on the floor, and gave as his opinion that the fire had been intentionally set by someone. He saw a body in a sitting position on the first floor at the rear, with the back against the wall. The body was removed by the morgue wagon. Outside the house Captain Powell found several empty containers which had a burned out appearance. There was no residue in the containers, and he did not know if they had been inside the house.

Detective Howard Corbin of the Homicide Squad, Baltimore City Police Department, testified that he and Detective Warren Moore talked to the appellant at the Central Station at about 5:10 A.M. on May 21, 1970. Appellant told them that at about 11:00 P.M. the evening before he was with his girlfriend Vanessa Jones. They were in the 800 block of Franklin and saw her brother, Alan Jones, on Fremont Avenue. She told Alan to go home. The next thing appellant remembered was being alongside 831 Franklin Street, alone. He heard Alan's voice calling, "Johnny help me, Johnny help me", and saw smoke and fire coming from the house. Appellant said he tried to get into the back and couldn't, so he ran across the street and asked for help. Firemen and police came. Appellant went to a friend's house and changed his clothes. He told the detectives he had not been with anyone other than Vanessa, but when told that Vanessa had denied seeing him that evening, he said he had been with a girl named Corinne. He could not explain how Alan could have seen him or could have known that he was walking across the lot by the house. He said he had been drinking and didn't remember much.

At the time of this questioning, appellant's clothing appeared very neat and freshly cleaned. The detective observed a cleaner's tag on one of his garments.

The following morning, at about 2:30 A.M. on May

22nd, Detectives Corbin and Moore again interviewed appellant. Appellant told the detectives on that occasion that he remembered that he had been in the house with the boy, Alan Jones, and that he recalled the fire, but that he had blacked out and couldn't recall whether he had done the things that people would tell him he had done.

Detective Corbin further testified that he was at the scene of the fire at 2:50 A.M. He entered the house and looked at all three floors. He said that on the second floor there was a closet with a door, but there was no lock on the door.

Vanessa Jones, sister of the deceased and mother of appellant's child, testified that she and appellant had broken up, and she had not seen him for several days. On the evening of May 20, 1970, when her ten year old brother Alan did not return home, she and other members of her family searched several places for him, and finally at about 3:00 A.M. on May 21st she went to the police station. Carolyn Darby, apparently the woman described by appellant whose name the police recorded as Corinne, testified that she had known appellant and his family for several years, that a little after 10:00 P.M. on May 20, 1970, she had met appellant, near Fremont and Franklin Streets, with a little boy about ten years old. At a carry-out they bought some Chinese food containing noodles and went to her apartment, where they sat and talked, and ate the food. They had no alcoholic beverages. Appellant told her the boy was his girlfriend's brother, and that he had promised to take the boy to his home to spend the night. She suggested to him that a weekend would be better than a week night, because the boy would have to go to school and appellant would have to go to work in the morning. Appellant agreed, and said he would have the boy spend the night with him some other time. Mrs. Darby said appellant showed her a penknife that he said he carried for protection in case anybody bothered him. Later the three of them walked to Fremont and George Streets, where they parted a little

after midnight. The 800 block of Franklin Street was one block away. She saw appellant and the boy walking towards Fremont and Franklin.

A Mr. Coles, who lived across the street from the scene of the fire, was called as the only defense witness. Between 1:00 and 1:30 A.M. on May 21, 1970, he was awakened by knocking on the door next to his. He and his neighbor both responded. A young man asked for water and said there was a fire across the street, and said there was a little boy in the house on the second floor locked in the cupboard. The three of them and an officer who had arrived, pulled off the plywood with which the front door of the burning house was boarded up. The young man grabbed the officer's searchlight and went into the house for a few seconds, shined the light into a corner, and said, "There he is". The witness and his neighbor and the young man went back across the street. He could not identify appellant in court as the young man he described.

In rebuttal, Patrolman Bernard Harper of the Baltimore City Police identified appellant as one of the three men who helped him pull the plywood off the door, and as the man who took the officer's flashlight and entered the burning house.

There was no admission by appellant, and no testimony of any witness, that appellant inflicted the blow or blows to the head of the victim, or ignited the fire, the two instruments of death in this case. The evidence against appellant was therefore circumstantial. In considering the sufficiency of circumstantial evidence in *Metz v. State*, 9 Md. App. 15, 262 A. 2d 331, at page 23, Judge Orth, speaking for this Court, said:

> "We think that the test as to the sufficiency of evidence may be stated as follows:
> To be sufficient in law to justify a conviction, the admissible evidence adduced must show directly, or circumstantially, or support a rational inference of, the facts to be

proved from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged.

In short, we feel that the test for sufficiency is the same whether the evidence be direct, circumstantial, or provided by rational inferences therefrom."

We need not repeat any of the foregoing exhaustive recital of the evidence to demonstrate any more clearly that rational inferences from it could fairly convince the jury, beyond a reasonable doubt, of the defendant's guilt.

The trial judge correctly denied the motion for judgment of acquittal.

### Admissibility of Statements Made by Appellant

Appellant filed a pretrial motion directed to, *inter alia,* suppression of the statements he had made to the police. During the trial, out of the presence of the jury, Judge Sodaro heard evidence on the admissibility of the statements. Detectives Corbin and Moore each testified at length on the issue. Appellant offered no evidence in that hearing. In his brief he contends that "the statements, under the totality of the circumstances leading to obtention, should have been suppressed."

The ultimate determination of the voluntariness of the statements was for the jury, as was the determination of all factual questions presented by the evidence. In *Walker v. State,* 12 Md. App. 684, 280 A. 2d 260, we quoted from *Gardner v. State,* 10 Md. App. 233, 245, 269 A. 2d 186, as follows:

"It is true that in reaching the preliminary decision as to the voluntariness of the statement the court need not find beyond a reasonable doubt that the confession was voluntary; the only duty of the trial court at that point is to

decide whether the *prima facie* proof was such as to establish that the confession was freely and voluntarily made. So the preliminary decision of the court as to the admissibility of the confession, made within the required constitutional framework, will not be disturbed on appeal unless there was a clear abuse of discretion. *Barnhart v. State, supra,* at 224-226. But in determining whether the court made its decision within the required constitutional framework we must do so within the rule that '[w]hen constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record.' *Brookhart v. Janis,* 384 U. S. 1, note 4 at p. 4."

In *Walker v. State, supra,* Judge Moylan, for this Court, went on to say, at page 695:

"What we mean, therefore, when we say that we have the obligation to make an independent, reflective constitutional judgment on the facts whenever a claim of a constitutionally-protected right is involved is that, although we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time that an interrogation began, whether a meal was or was not served, whether a telephone call was requested, etc.) we must make our own independent judgment as to what to make of those facts; we must, in making that independent judgment, resolve for ourselves the ultimate, second-level fact—the existence or non-existence of voluntariness."

Our review, made within the required framework, discloses that before each of the two interviews with appellant, Detective Corbin read to appellant an "Explanation of Rights", Police Department Form 67/69. Each

time appellant said he understood the explanation. Each time Detective Corbin then asked appellant to read the form aloud, which he did. The two forms were admitted in evidence as State's Exhibits 2 and 3. Each was signed by appellant, and his signature on each was witnessed by Detectives Corbin and Moore. Each of the detectives testified as to each of the two occasions there were no promises, inducements or threats made to appellant, and no coercion or force applied to him.

Appellant offered no evidence at this hearing on the admissibility of his statements to the police, but in that connection we also consider what he said in a hearing before the jury was impanelled on his motion to suppress evidence. He stated:

> "If any statements are allegedly supposed to have been made was used by police brutality. Because it not only can be used, police brutality by beating you, as a mental force at the same time. Because I am and was at that time a drug addict, and I was going through withdrawal symptoms. So any statements that I so allegedly supposed to have made was used through police brutality."

We take this to be a contention by appellant that at the times of the statements, his mental or emotional condition was such as to render them involuntary, but we agree with the ruling of the trial judge that the statements were *prima facie* voluntary, and thus admissible.

## The Rulings on Appellant's Motions

Appellant filed a number of pretrial motions. All were heard and denied by Judge Sodaro before the trial itself was begun. The motions were renewed orally at the close of the State's case and again at the close of all the evidence, and were denied. The points raised by the motions, and asserted in the brief on appeal, may be summarized as follows:

A. Appellant contends that the indictment should be dismissed (or "quashed") because:

1. It was based on inadequate evidence, and he was not identified by anyone who said he committed any crime.

2. He was denied his right to a lineup.

3. He was denied his right to confront witnesses when they made statements to police.

4. He was denied his right to counsel at his preliminary hearing.

B. Appellant contends that the evidence against him should be suppressed because:

1. His arrest was illegal.

2. His statements were coerced.

3. His constitutional and civil rights were abridged.

C. The indictment should be dismissed because appellant was denied a speedy trial.

A. Judge Sodaro heard evidence, and found that no preliminary hearing was held, only a bail hearing, *Hebron v. State,* 13 Md. App. 134, 281 A. 2d 547. Appellant was not entitled to have counsel provided for him. The bail hearing was held on May 22, 1970. In *Billings v. State,* 10 Md. App. 31, 267 A. 2d 808, we held that the *Coleman* [3] requirement of counsel at a preliminary hearing was not effective retrospectively to cases in which the hearing was held before June 22, 1970. The other reasons advanced for dismissal of the indictment have been considered, and clearly have no merit.

B. Even if the arrest were illegal, it would not preclude trial on a proper indictment, nor the use in evidence of subsequent voluntary statements. *McDonald v. State,* 10 Md. App. 258, 269 A. 2d 193. Appellant's assertion that his constitutional and civil rights were abridged, as made in support of his motion to suppress evidence, appears to be directed to the manner in which statements were taken from him, and the absence of counsel representing him when he made the statements. In

---

3. *Coleman v. Alabama,* 399 U. S. 1, 90 S. Ct. 1999.

determining the *prima facie* voluntariness of the statements the lower court also disposed of any question of coercion or abridgment of rights.

C. The chronology of this case shows indictment June 9, 1970, motion for speedy trial June 15th, arraignment and appointment of counsel June 30th, plea of insanity July 17th, report of psychiatric evaluation October 5th, motion for discovery and inspection December 17th, answer of State February 17, 1971, trial begun February 18th, and verdict February 23rd.

The law relating to the constitutional right of an accused to a speedy trial was exhaustively reviewed and discussed in *State v. Lawless*, 13 Md. App. 220, 283 A. 2d 160. It needs no further discussion here. Our independent review of the facts in the light of that law discloses no abridgment of appellant's right to a speedy trial.

We find no reversible error in this case.

*Judgment affirmed.*